## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

TONY ISHO (Formally WALEED ISHO)

     Plaintiff

vs.

CITY OF DETROIT, a municipal corporation,
DETROIT POLICE DETECTIVE THOMAS HORNER,
DETROIT POLICE OFFICER TERRENCE LAURENCELLE,
DETROIT POLICE SERGEANT WILLIAM PENDERGAST,
DETROIT POLICE LIEUTENANT JAMES AKRON,
DETROIT POLICE SERGEANT EUGENE GOODE,
DETROIT POLICE SERGEANT RON CONNELL,
DETROIT POLICE OFFICER ROBERT COLLINASH,
AGENT KIRK FLASHNER ARSON EXPLOIVE UNIT ATF,
INVESTIGATOR JAMES MAY,
ATF AGENT MARY LOU FOLTS,
ATF AGENT PATRICIA PANNUTO,
ATF AGENT MARK DILLOW,
DETROIT POLICE SERGEANT ROBERT WILSON,
DETROIT POLICE OFFICER DAVID PAUCH,
DETROIT POLICE OFFICER RAYMOND JEFFRIES
Current and/or former DETROIT POLICE SUPERVISORS, all
Acting in their official and/or individual capacities, OTHER AS-OF-YET
UNKNOWN EMPLOYEES OF THE CITY OF DETROIT, AND OTHER AS-OF-YET
UNKNOWN EMPLOYEES AND/OR AGENTS OF THE ATF.
jointly and severally,

     Defendants.

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Case No:

Marvie W. Neubauer (P71556)
*Attorney* for Plaintiff
Neubauer Legal Services
3128 Walton Blvd. #226
Rochester Hills, MI 48309
(248)629-9694
neubauerlegal@gmail.com

Valentina Lucaj (P70862)
*Attorney* for Plaintiff
The Lucaj Law Firm, PLLC
101 W. Big Beaver Rd. Ste 1000
Troy, MI 48084
(248) 457-7000
Valentina@LucajLaw.com

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1

NOW COMES Plaintiff, TONY ISHO (Formally WALEED ISHO), by and through his attorneys and for his Amended Complaint against the above-named Defendants, jointly and severally, does hereby allege as follows:

## PRELIMINARY STATEMENT

1.      This is a civil action in which Plaintiff Tony Isho, seeks relief for extraordinary and ongoing injuries stemming from Defendants' violation, under the color of law, of his rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42 U. S. C. § 1983, the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and the Constitution of the State of Michigan.

2.      Mr. Isho was arrested on August 16, 1989, and wrongfully convicted on February 12, 1990, of four felony counts of assault with intent to commit murder, one count of conspiracy, and one count of placing explosives with intent to destroy or cause injury, arising from the July 27, 1989, bombing of the Total Gas Station on the corner of 7 Mile and Woodward.

3.      Upon his conviction, Mr. Isho's legal status as a Green Card holder, on the path to citizenship, was revoked.

4.      Mr. Isho spent nearly fourteen years in prison and two years on probation before being released.

5.      Upon Mr. Isho's release, Mr. Isho reported to Immigration and Customs Enforcement ("ICE"), at which time he was detained for the first of two times.

6.      A deportation order was entered against Mr. Isho on October 19, 1995.

2

7.      He was later detained in September 2017 through February 2018, at which time deportation proceedings were initiated against him and the enforcement of the 1995 order.

8.      As a result of the imminent deportation and threat to Mr. Isho's life, Mr. Isho retained counsel to attempt to overturn his original convictions.

9.      Mr. Isho has spent the last thirty-three (33) years either in prison, on probation, detained by Immigration and Customs Enforcement, or at risk for deportation with deportation proceedings against him due to the torturous wrongful imprisonment, wrongful arrest and malicious prosecution of Mr. Isho.

10.      Mr. Isho was able to provide a Wayne County Judge with evidence of the constitutional violations that caused Plaintiff's wrongful convictions, so much so that the Judge vacated all six felony counts and overturned Plaintiff's convictions.

11.      Mr. Isho's arrest was not an accident, but rather a direct result of the serious misconduct of the Defendants who railroaded an easy and vulnerable target.

12.      The wrongful acts, intimidation, and misconduct of the Defendants herein caused witnesses to lie under oath, to falsely and arbitrarily identify Mr. Isho, and prevented the defense from learning that the "identification" – which was substantially the only evidence linking Mr. Isho to the crime - was both the product of intimidation, undue suggestion, bribery, and otherwise unreliable.

13.      The Defendants, acting jointly and severally, caused Mr. Isho to be subjected to violations of this constitutional rights under the Fourth and Fourteenth Amendments, amounting to an unlawful seizure of his person, by way of false imprisonment, withholding of exculpatory evidence, and malicious prosecution, all of which resulted in his unjust arrest, trial,

conviction, imprisonment, detention, and deportation proceedings for the past thirty-three (33) years, for a crime which Defendants knew or had actual notice that he did not commit.

14. The conduct of the Defendant Detroit Police Department Officers was made possible by the Defendant City of Detroit's policy, custom, practice of failing to property train and supervise police officers in their investigations, including conducting and documenting identification procedures, avoiding manipulating, and shaping of recollections of witness, intimidation of witnesses, preparing investigative reports, and disclosing exculpatory evidence.

15. Had the Defendant Detroit Police Department Officers been properly trained and supervised, an innocent man would not have lost thirty-three (33) years of his life.

16. Defendant City of Detroit was deliberately indifferent to the known and obvious consequences of its policies and customs regarding criminal investigations, which was that innocent men and women would be illegally and unjustly convicted by intimating, unduly suggestive and arbitrarily conducted identification procedures.

17. Moreover, the illegal and unconstitutional conduct committed by the Defendants, not only sent an innocent man to prison, but it also allowed the real bomber to continue commit more of these bombings throughout Wayne County.

18. On November 24, 2020, Plaintiff was finally exonerated from his crimes.

19. Mr. Isho has suffered tremendous injuries as a result of this wrongful imprisonment and conviction.

20. Mr. Isho has suffered irreparable harm.

21. Beyond compensating Mr. Isho for the nearly decade and half he spent incarcerated, his incarceration while awaiting deportation and removal proceedings, and his continued suffering for the past thirty-three years, this action seeks to remedy the Defendant City of

4

Detroit's unlawful policies, practices, and/or customs of routinely conducting unlawful interrogations, and of failing to adequately train, supervise, and/or discipline its officers that led Defendant Officers to violate Mr. Isho's constitutional rights as secured by the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and the laws of the State of Michigan.

22.     Through this action, Mr. Isho seeks compensatory damages and punitive damages, declaratory relief, an award of reasonable attorney fees and costs, and such other relief the Court deems proper.

23.     Beyond compensating Mr. Isho for the thirty-three years that he has been suffering ongoing consequences directly attributable to the Defendants' respective actions, all pursuant to the customs, policies, and practices of the Defendant City of Detroit, this action seeks to remedy the unlawful City of Detroit policies, practices, and customs of failing to adequately train and supervise its officers, which led to Defendants' violation of Mr. Isho's constitutional rights as granted by the United States Constitution and the laws of the State of Michigan.

## JURISDICTION

24.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and the Constitution of the laws of the State of Michigan.

25.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343 and 2202 as this action seeks redress for the violation of Plaintiff's federal constitutional and civil Rights.

26.     Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

27. Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

28. Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b), in that this is the judicial district in which the events giving rise to the claim occurred.

29. The amount in controversy exceeds seventy-five thousand ($75,000) dollars.

## PARTIES

30. Plaintiff, Tony Isho (Formally Waleed Isho), was a resident of Wayne County Michigan at the time of his arrest, conviction and imprisonment. He is currently a resident of Macomb County Michigan,

31. Defendant City of Detroit is a municipal corporation, authorized under and created by the laws of the State of Michigan. It is and has been at times relevant hereto, authorized by law to maintain and operate a Police Department. By and through its agents, including but not limited to Chief of Police, its supervisors, operating officers, Boards, Commissions and Committees and its final policymakers, Defendant City of Detroit, at all times relevant hereto, established, promulgated and implemented the policies, written and unwritten, of the Detroit Police Department ("DPD"), with regard to hiring, training, supervision and discipline of the employees of said department, as well as the investigative practices and procedures of its Bomb Squad Unit and the officers who worked within that Unit.

6

32. At all times relevant to this action, DPD is and was an official department of Defendant City of Detroit.

33. Defendant Sergeant THOMAS HORNER was at all times relevant herein a police officer acting within the scope of his authority under the color of law as a Sergeant with the Detroit Police Department and was the Officer in Charge of the Investigation and subsequent arrest, prosecution and conviction of Plaintiff Tony Isho.

34. Defendant Officer RAYMOND JEFFERIES was at all times relevant herein a police officer and evidence technician acting within the scope of his authority under the color of law as an evidence technician with the Evidence Technician Unity of the Detroit Police Department, who gathered and tested evidence from the crime scene and testified at Plaintiff's criminal trial in that capacity.

35. Defendant Officer TERRENCE LAURENCELLE was at all times relevant herein a police officer and evidence technician acting within the scope of his authority under the color of law as an evidence technician with the Evidence Technician Unity of the Detroit Police Department, who gathered and tested evidence from the crime scene and testified at Plaintiff's criminal trial in that capacity.

36. Defendant Officer ROBERT COLLINASH was at all times relevant herein a police officer and evidence technician acting within the scope of his authority under the color of law as an evidence technician with the Evidence Technician Unity of the Detroit Police Department, who gathered and tested evidence from the crime scene and testified at Plaintiff's criminal trial in that capacity.

37. Defendant KIRK FLASHER was at all times, relevant herein a police officer assigned to the Arson Explosive Unit encompassing the City of Detroit, as an employee of the

United States Treasure Bureau of Alcohol, Tobacco and Firearms, working through the Detroit office, who gathered evidence and testified at Plaintiff's criminal trial in that capacity.

38.    Defendant Sergeant WILLIAM PENDERGRAST was at all times relevant herein a police officer acting within the scope of his authority under the color of law as a Sergeant with the Special Investigation Crimes Against Property Unit for the Detroit Police Department, and gathered evidence, investigated, interrogated and interviewed witnesses, and testified in Plaintiff's criminal trial in that capacity.

39.    Defendant Sergeant ROBERT WILSON, was at all times relevant herein a police officer acting within the scope of his authority under the color of law as a Sergeant with the Bomb Squad for the Detroit Police Department, gathered evidence, and testified in Plaintiff's criminal trial in that capacity.

40.    Defendant OFFICER DAVID PAUCH, was at all times relevant herein a police officer acting within the scope of his authority under the color of law as a Sergeant with the Bomb Squad for the Detroit Police Department, gathered evidence, and testified in Plaintiff's criminal trial in that capacity.

41.    Defendant OFFICER EUGENE GOODE, was at all times relevant herein a police officer acting under the color of law a Sergeant with the Police Fire Arson Unit for the Detroit Police Department, gathered evidence, and testified in Plaintiff's criminal trial in that capacity.

42.    Defendant POLICE SERGEANT RON CONNELL, was at all times relevant herein a police officer acting under the color of law a Sergeant with the Detroit Police Department, gathered evidence and conducted investigations leading to the arrest and conviction of Mr. Isho.

43. Defendant POLICE LIEUTENANT JAMES AKRON, was at all times relevant herein a police officer acting under the color of law with the Police Fire Arson Unit for the Detroit Police Department, gathered evidence and conducted investigations leading to the arrest and conviction of Mr. Isho.

44. Defendant POLICE INVESTIGATOR JAMES MAY, was at all times relevant herein a police officer acting under the color of law with the Detroit Police Department, gathered evidence and conducted investigations leading to the arrest and conviction of Mr. Isho.

45. Defendant POLICE AGENT MARY LOU FOLTS, was at all times relevant herein a police officer assigned to the Arson Explosive Unit encompassing the City of Detroit, as an employee of the United States Treasure Bureau of Alcohol, Tobacco and Firearms, working through the Detroit office, who gathered evidence and conducted investigations leading to the arret and conviction of Mr. Isho.

46. Defendant POLICE AGENT PATRICIA PANNUTO, was at all times relevant herein a police officer assigned to the Arson Explosive Unit encompassing the City of Detroit, as an employee of the United States Treasure Bureau of Alcohol, Tobacco and Firearms, working through the Detroit office, who gathered evidence and conducted investigations leading to the arret and conviction of Mr. Isho.

47. Defendant POLICE AGENT MARK DILLOW, was at all times relevant herein a police officer assigned to the Arson Explosive Unit encompassing the City of Detroit, as an employee of the United States Treasure Bureau of Alcohol, Tobacco and Firearms, working through the Detroit office, who gathered evidence and conducted investigations leading to the arret and conviction of Mr. Isho.

48.     At all times relevant herein, the individual Defendants violated clearly established rights guaranteed by the Fourth, Fifth Sixth and Fourteenth Amendments of the United States Constitution, rights of which a reasonable police officer and/or public official under these circumstances would have known, and of which in this case Defendants were on actual notice.

## STATEMENT OF FACTS

49.     Plaintiff incorporates by reference each preceding paragraph as if fully restated herein.

50.     At approximately 10:05 P.M., on July 27, 1989, the Total Gas Station, located at 19050 Woodward Avenue, Detroit, MI 48203, was bombed.

51.     On August 15, 1989, during the early morning hours, sometime between 5:00 am and 7:00 am, Mr. Isho woke up to five or six police officers in his bedroom, with guns and rifles pointed at the back of his head, screaming at him asking, "where's the dynamite?"

52.     Mr. Isho answered the Defendants by stating he had no idea what they were talking about, at which time, an officer slammed his face into his bedroom wall and asked him again, "where did you hide the explosives?".

53.     Once again, Mr. Isho explained that he didn't know what they were talking about. While in his underwear, Mr. Isho was escorted downstairs by all the officers at which time he saw his elderly parents and four brothers lying face down on the floor with officers aiming weapons at the back of their heads.

54.     Mr. Isho and his family were escorted out of their home, and they watched while the Defendant Police Officers searched the entire property, unsuccessfully, for any evidence linking him to the bombing of the gas station.

10

55.     Mr. Isho was allowed to get dressed and was escorted to the police station located at 1300 Beaubien, Detroit, MI.

56.     Mr. Isho was taken to the police station where he was interrogated, deprived of food, and detained by the Defendants for several days about a bombing he knew nothing about.

57.     He was advised as to the bombing and was pressured by the Defendants to tell them about the "Chaldean Mob."

58.     Mr. Isho did not have information to provide, so the Defendants threatened him with violence, deprived him of food for days, and denied him basic necessities including, by not limited to, toilet paper.

59.     Defendant Terrence Laurencelle, an evidence technician for the Detroit Police Department, testified that he responded to the scene of the explosion.

60.     Defendant Laurencelle testified as to the extent of the damage in the building, including broken glass, twisted metal, broken concrete, as well as several items that were thrown about.

61.     Defendant Kirk Flashner, of the United States Treasury Bureau of Alcohol, Tobacco and Firearms, and Defendant Robert Wilson, Detroit police sergeant, assigned to the bomb squad, both testified to the extent of the damage, and that the damage was caused by an unknown high explosive.

62.     Witness Felicia McCalvin, the purported sole frontal witness to the bombing, testified that she was working at the gas station on the evening of July 27, 1989, and was in the cashier area at the time of the explosion.

63.     Witness Michelle Brown was visiting her best friend Felecia McCalvin at the Total Gas Station at the time of the bombing. Michelle Brown testified that she was standing in the

11

doorway visiting Felicia McCalvin and was waiting for Charles Naji to leave the gas station when the perpetrator threw the bomb into the gas station.

64. Witness Charles Naji, the manager of the gas station, testified that he was at the gas station on the night of the explosion, and that he had been accompanied by his aunt and uncle.

65. Witness Martin Nwoso, the uncle of Charles Naji, testified that he and his wife Marsha Nwoso, were at the gas station on the night of the explosion, in the back seat of Charles Naji's new car at the time of the explosion.

66. Witness Emmett Williams testified that he was working security at the gas station on the evening of July 27, 1989, and he was inside the building, standing on the south side of the door in the area near the soda merchandise when he saw the bomb, though he did testify he could not see the face of the bomber, only his back. From what he could see, he testified he was unable to identify the man.

67. Witness Reginald Davis testified that he lived in the neighborhood and that he was at the gas station on the night of the explosion, and that he spoke to a person coming from the vacant lot to the south of the station, who warned Davis to leave the station before the explosion.

**Defendants' Orchestrated an Impermissibly Suggestive Photographic Array and Improperly Influenced The Corporeal Lineup**

68. Defendant William Pendergast of the Detroit Police Department testified that he interviewed Felicia McCalvin on August 1, 1989.

69. Defendant Police Officers interviewed and discussed the crime with Felicia McCalvin and Michelle Brown.

12

70.    On August 14, 1989, Felicia McCalvin and Michelle Brown viewed a photo array for the purpose of identifying the perpetrator of the bombing. Both McCalvin and Brown were shown identical photo arrays.

71.    Michelle Brown told Defendant Police Officers that she did not believe Mr. Isho was the bomber.

72.    Michelle Brown told Defendant Police Officers' that the bomber was in the crowd after the explosion, and it wasn't Mr. Isho but "they [Defendants] did not listen" her.

73.    Michelle Brown further stated the photo provided of Mr. Isho looked "something like him [the bomber] but the bomber had "razor bumps on his face and his hair was short."

74.    By contrast, at the time of Mr. Isho's arrest, Mr. Isho had long hair and some facial hair, not razor bumps.

75.    The photo array provided to Brown and McCalvin showed Mr. Isho as the only Middle Eastern-looking, dark complected person in the photo array.

76.    Defendants also altered the description of Mr. Isho's height and weight on the photo arrays to better align with the description of the bomber.

77.    Felicia McCalvin identified Mr. Isho as the perpetrator after being promised protection and money from the Defendants.

78.    Michelle Brown signed an affidavit, after Mr. Isho was convicted, stating her best friend Felicia McCalvin was paid by Defendants to lie and identify Mr. Isho as the bomber.

79.    On August 17, 1989, Charles Naji and Emmet Williams viewed a live line-up at police headquarters. Mr. Isho was the only person of Middle Eastern or Chaldean descent in the line-up.

13

80.     Naji identified Isho, who he knew was a customer that frequented the gas station, even though Naji testified he only saw the back of the bomber.

81.     Williams, the security guard, also saw the back of the bomber, but could not positively identify Isho.

82.     It is and was impermissibly suggestive to only have one person of Middle Eastern decent in the line-up, while it was known to the witnesses that the focus of the investigation was an Arabic (Middle Eastern)- Chaldean man.

83.     The Defendants knew it was improper and acted with disregard and malice by placing only one Middle Eastern man in the line-up.  Defendants knew it would lead to a substantial likelihood the witnesses would misidentify Ms. Isho as the bomber.

84.     Further, the identification procedures were extremely suggestive. In the photo line-up, there was also, on average, a difference of 10 years, 40 pounds, and 4 inches between Mr. Isho and the others in the corporeal lineup and photographic array.

85.     McCalvin was the only witness to claim to see the bomber's face, however, she provided inconsistent descriptions of the bomber, and moreover, admitted she only observed the bomber "very vaguely."

86.     McCalvin was only 20 years old at the time of the bombing.

87.     McCalvin later admitted in a deposition held on June 3, 2021, the Defendants pressured her into lying under oath and pressured her into identifying Mr. Isho as the bomber, even though she previously stated Mr. Isho was not the bomber.

88.     McCalvin testified that the Defendants forced her to lie and provide false testimony by identifying Mr. Isho as the bomber. Defendants offered to pay McCalvin for her testimony and offered her protection for her false testimony at trial.

14

89.     Had the Defendants disclosed the misleading, inaccurate, and exculpatory ("Brady") evidence, the prosecutor would have had an obligation to provide that information to the defense, as it clearly affects the identification made by the witnesses and provides further impeachment evidence of Witness McCalvin.

90.     The Defendants' unconstitutional and illegal conduct was the centerpiece of the prosecutor's case.

91.     At Mr. Isho's preliminary examination, it was established that Mr. Isho, "was the only Arabic man in the line-up" making the identification procedures so impermissibly suggestive as to give rise to the substantial likelihood of irreparable misidentification amounting to denial of due process of law.

92.     A reasonable police officer in Defendant's shoes would have known that such suggestive conduct was unlawful and violated the Plaintiff's clearly established constitutional rights under the fifth, sixth, and fourteenth Amendments.

93.     Furthermore, it is well established law that when an individual is not in custody, but is the focus of an investigation, counsel must be present when the purpose of photographic identification is to build a case against that person by eliciting evidence and not to extinguish a case against an innocent bystander.

94.     In this case, Isho was indeed the "focus" or target of the investigation by the Defendants on August 14, 1989.

95.     The record shows McCalvin provided a statement and a description of the bomber to police on August 1, 1989. Charles Naji provided the police with a statement on August 8, 1989, as a man previously seen at the station. However, the descriptions changed numerous times, and continued to change even through testimony during the trial.

15

96. Although Mr. Isho was the focus of the investigation, the police concluded the bombing involved several people.

97. Defendant Police Officers identified the car that the purported bomber drove, however it was not Mr. Isho's car.

### Defendants Intimidate and Threaten Alibi Witnesses

98. Mr. Isho had several alibi witnesses to account for his time during the bombing.

99. Defendants interrogated four alibi witnesses that all claimed Mr. Isho was with them on the night of the incident.

100. Margaret Neuville, an alibi witness for Isho, was intimidated, harassed, and pressured by the Defendants to provide false incriminating testimony against Mr. Isho, but she refused.

101. Kara Struski and Patricia Neuville were also alibi witnesses for Mr. Isho, and were also intimidated, threatened, harassed by Defendants to provide false incriminating testimony against Isho, but they refused.

102. The Defendants' failure to turn Isho's friends against him only emboldened them to fabricate other evidence to convict Mr. Isho.

### Plaintiff Maintained His Innocence

103. No other person other than Mr. Isho was arrested for the crime.

104. Tony Isho remained incarcerated from August 15, 1989, the date of his arrest, through September 28, 2002.

105. Mr. Isho has consistently maintained his innocence.

106. Mr. Isho could have confessed or admitted to wrongdoing to be paroled earlier, however refused because he was and is innocent.

107. There were several other bombings in the City of Detroit of other gas stations and other buildings, none of which were ever attributed to Mr. Isho.

108. Several of the bombings occurred while Mr. Isho was wrongfully incarcerated.

109. In 1989, when Mr. Isho sought a pre-conviction reduction in bond from one million dollars, it was actually increased to two million dollars. This led to Mr. Isho remaining detained from date of arrest until his release in 2002.

110. Mr. Isho was sent to several maximum-security prisons based on the nature of the crime he was wrongfully convicted.

111. Mr. Isho endured horrible conditions while in prison, including being in Michigan prisons, during the winter with broken windows and nothing to keep warm.

112. During his time in prison, Mr. Isho was assaulted several times.

113. During his time in prison, Mr. Isho required medical attention and received two surgeries on this nose, which remains damaged to this day. Mr. Isho's visibly broken nose makes it difficult for him to breathe and sleep.

114. During his time in prison Mr. Isho's property was stolen from him, including but not limited to, two television sets.

115. From 1990 through 2002, Mr. Isho continued to seek release and relief from his wrongful conviction.

116. After his release in 2002, Mr. Isho was still forced to seek relief from his conviction due to the ongoing threat of deportation.

117. Mr. Isho filed appeals, requests for records, FIOA requests; he tried everything to prove the injustice against him, however, he was constantly deterred from being successful.

**Defendant City of Detroit's Custom, Pattern, and Practice of Failing to Adequately Train, Supervise, and Discipline Defendant Police Officers in Connection with Felony Investigations**

118.    It was the custom and policy of the Defendant City of Detroit, by and through its final policymakers, to authorize, ratify, condone, tolerate and approve illegal and unconstitutional actions by Defendant Detroit Police Department officers, supervisors and investigators.

119.    Those illegal and unconstitutional actions and practices included but were not limited to:

(a) Conducting inadequate investigations into serious crimes by making arbitrary arrests in order to close cases quickly and affirmatively choosing not to develop or pursue actual leads and evidence.

(b) Knowingly and deliberately fabricating evidence as a way to establish probable cause to arrest and obtain a conviction.

(c) Engaging in unreliable, unduly suggestive behavior and improperly documenting line-ups; and

(d) Ignoring their constitutional duty to disclose evidence to prosecutors and defense counsel, including the concealment of improper suggestions on the part of officers conducting line-ups.

120.    Defendant City of Detroit, by and through its final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate investigatory techniques, evidence collection and evidence disclosure.

121.    Through this custom and policy of failing to adequately train, supervise or discipline its officers, Defendant City of Detroit abdicated its duty to ensure that officers would:

      (a) Conduct constitutionally adequate investigations;

      (b) Never fabricate inculpatory evidence;

      (c) Obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted;

      (d) Disclose to prosecutors and defense counsel material information favorable to criminal defendants such as Mr. Isho;

      (e) Follow the duties imposed by Brady v. Maryland and its progeny; and

      (f) Refrain from administering arbitrary and unduly suggestive identification proceedings.

122.    Defendant City of Detroit, by and through its final policymakers, had actual notice of the Detroit Police Department's failures to train, supervise and/or discipline its employees. It failed to train and supervise them despite the obvious need, and although the City of Detroit knew that it was foreseeable that their police officers would predictably confront these situations, and that as a result of the failure to train, supervise and/or discipline, constitutional violations would result.

123.    Because of these unconstitutional customs and policies maintained by Defendant City of Detroit, individuals such as Plaintiff Tony Isho were wrongfully arrested, convicted and imprisoned in violation of their constitutional rights.

**DAMAGES**

124.    As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff Tony Isho has suffered severe damages, many of which effects continue to plague Mr. Isho to this day and will plague him for the rest of his life, including but not limited to:

a.      Deprivation of liberty;

b.      Personal and physical injuries;

c.      Pain and suffering;

d.      Severe mental anguish;

e.      Emotional distress;

f.      Extreme fear;

g.      Economic damages including loss of income;

h.      Infliction of physical illness and injury resulting from his confinement;

i.      Inadequate medical care; humiliation, indignities, and embarrassment;

j.      Degradation;

k.      Permanent loss of natural psychological development,

l.      Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.      Damage to his relationship with his family, including but not limited to his many family members that passed away while Mr. Isho was in prison.

20

n.      Revocation of his Green Card.

o.      Limitations on employment.

p.      Felony record for the past 33 years.

q.      Failure to obtain his citizenship.

r.      Detention by Immigration and Customs Enforcement.

s.      Deportation proceedings initiated against him.

t.      Due to the risk of deportation, Plaintiff feared if he had children, they may have to grow up without the presence of a father.

## CLAIMS

### FIRST CLAIM FOR RELIEF

**42 U.S.C. § 1983: FOURTH, AND FOURTEENTH AMENDMENT VIOLATIONS FABRICATION OF INCULPATORY EVIDENCE, AND COERCION**

125.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

126.    By their conduct, as described herein, Defendants', while acting individually, jointly, severally and in conspiracy with one another, are liable to Plaintiff Tony Isho under 42 U.S.C. § 1983, for the violation, under color of law, of his constitutional rights to be free from unreasonable searches and seizures of his person, in particular false imprisonment and malicious prosecution, under the Fourth and Fourteenth Amendments to the United States Constitution; and his constitutional right to be free from any deprivation of liberty without due process of law under the Fourth and Fourteenth Amendments to the United States Constitution.

127.    Defendants' acting deliberately, recklessly and/or intentionally, at all times under color or law, created an impermissibly suggestive photo array and line-up to get the victims

21

and witnesses to select Mr. Isho. Defendant Police Officers have any reasonable cause to believe Mr. Isho committed this crime, based on all the facts known to them at the time and what a reasonable police officer would have believed under the same circumstances.

128. Defendants' acting deliberately, recklessly and/or intentionally, at all times under color or law, deprived Mr. Isho of his due process right to a fair criminal proceeding by fabricating inculpatory evidence, withholding exculpatory evidence and coercing witnesses to testify falsely.

129. At all times herein, Defendants knowingly caused the State to initiate or continue a criminal prosecution against the Plaintiff, Tony Isho.

130. As to that criminal prosecution:

(a) The prosecution was initiated or continued by Defendants' acting without probable cause.

(b) Defendants acted without probable cause and ultimately manufactured probable cause to initiate and continue the criminal prosecution of Mr. Isho knowing the following facts:

1. The victims were unable to positively identify Isho to any officer. McCalvin, being the only frontal witness, was the only witness to "identify" Isho, however, was inconsistent in her description of the bomber. She further testified at a deposition that she was promised payment and protection by the Defendants to lie and say that Mr. Isho was the bomber. A direct act of coercion by the Defendants.

2. The line-up was unduly suggestive in that Mr. Isho was the only man of Middle Eastern decent in the lineup, even though Defendants

22

made it known to the witnesses that the focus of the investigation was a Middle Eastern man.

3. The victim's purported "identification" of Mr. Isho at the line-up was in fact tentative and did not constitute a positive identification at all.

(c) The prosecution was the result of malice on the part of the Defendants.

(d) After thirty-two (32) years, in November 2020, the prosecution ended in Plaintiff's favor, when he was exonerated, and all charges ultimately dismissed on a joint motion filed by Plaintiff and the Wayne County Prosecutor for relief from the original judgment of guilt entered in the criminal case in 1989.

131. At all times herein, each of the aforementioned Defendants violated the Plaintiff's clearly established right to be free from arrest and prosecution without probable cause.

132. Absent the Defendant Officer's violations of Mr. Isho's constitutional rights, Mr. Isho would not have had to face prosecution and incarceration.

133. The misconduct described herein was pursuant to the policies and practices of Defendant City of Detroit.

134. As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff Tony Isho has suffered severe damages, many of which effects continue to plague Mr. Isho to this day and will plague him for the rest of his life, including but not limited to:

a.    Deprivation of liberty

23

b.      Personal and physical injuries;

c.      Pain and suffering;

d.      Severe mental anguish;

e.      Emotional distress;

f.      Extreme fear;

g.      Economic damages including loss of income;

h.      Infliction of physical illness and injury resulting from his confinement;

i.      Inadequate medical care; humiliation, indignities, and embarrassment;

j.      Degradation;

k.      Permanent loss of natural psychological development,

l.      Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.      Damage to his relationship with his family, including but not limited to his many family members that passed away while Mr. Isho was in prison.

n.      Revocation of his Green Card.

o.      Limitations on employment.

p.      Felony record for the past 33 years.

q.      Failure to obtain his citizenship.

r.      Detention by Immigration and Customs Enforcement.

s.      Deportation proceedings initiated against him.

t.      Due to the risk of deportation, Plaintiff feared if he had children, they may have to grow up without the presence of a father.

## SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983: 5TH, 6TH AND 14TH AMENDMENTS
### DENIAL OF DUE PROCESS: FABRICATION OF INCULPATORY EVIDENCE.
### UNDULY SUGGESTIVE IDENTIFICATION PROCEDURES.

135.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

136.    Defendants knowingly and deliberately fabricated evidence that was used to arrest, indict, prosecute, and convict Mr. Isho despite knowing there was no reasonable basis to do.

137.    Defendants took this action with reckless disregard for the known and obvious likelihood that placing Mr. Isho in an improper line-up would undermine the reliability of the photographic array and lead to misidentification. Defendants then falsely reported that the witnesses positively identified Mr. Isho as the perpetrator in order to establish probable cause. This falsity was maintained in written reports and statements to the prosecution before the grand jury, pretrial hearings, and the trial.

138.    Defendants fabricated McCalvin's identification of Mr. Isho despite knowing that it was improper to place only one Middle Eastern man in the line up while it was known to the witnesses that the sole focus of the investigation was a bomber of Middle Eastern decent.

139.    Any reasonable officer in 1989 would have known—and these Defendants did know— that such arbitrary, reckless, and conscious-shocking conduct was unlawful and violated the Plaintiff's clearly established constitutional rights under the Fifth, Sixth and Fourteenth Amendments, especially given the totality of the circumstances. No reasonable officer would have believed this conduct was lawful.

140.    Defendants' fabrication, witness intimidation, making false promises to witnesses, and threats to witnesses, directly and proximately caused Mr. Isho's unfair trial, wrongful conviction, and deprivation of liberty without due process of law during his imprisonment, as well as all the ongoing injuries and damages set forth above.

141.    Furthermore, the photographic array and corporeal line-up described above was deliberately suggestive and conducive to irreparable mistaken identification as to violate Mr. Isho's due process right to be free of unduly suggestive identification procedures under the fifth, sixth and fourteenth amendments to the United States Constitution. Defendants nevertheless administered the identification procedures in the unconstitutional manner set forth above and falsely reported in written reports and reports to the prosecution prior to the pretrial hearings and trial that witnesses had affirmatively identified Mr. Isho.

142.    The unduly suggestive identification procedures described above directly and proximately caused Mr. Isho's unfair trial, wrongful conviction, and deprivation of liberty without due process of law during his imprisonment, as well as all the ongoing injuries and damages set forth above.

143.    Defendants knowingly and deliberately failed to document and disclose to either the prosecutors or to defense counsel material exculpatory and impeachment information, as required by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

144.    Defendants' intentional, malicious, bad-faith, and/or reckless failure to disclose material and exculpatory evidence of other bombings, results of those investigations, crime lab information, other suspects from the previous bombings and other information to both the prosecutors and defense counsel deprived Mr. Isho of significant exculpatory and

26

impeachment material that would have rendered any identification of the Plaintiff Tony Isho, meaningless and nonincriminatory.

145.   As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff Tony Isho has suffered severe damages, many of which effects continue to plague Mr. Isho to this day and will plague him for the rest of his life, including but not limited to:

a.   Deprivation of liberty

b.   Personal and physical injuries;

c.   Pain and suffering;

d.   Severe mental anguish;

e.   Emotional distress;

f.   Extreme fear;

g.   Economic damages including loss of income;

h.   Infliction of physical illness and injury resulting from his confinement;

i.   Inadequate medical care; humiliation, indignities, and embarrassment;

j.   Degradation;

k.   Permanent loss of natural psychological development,

l.   Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.      Damage to his relationship with his family, including but not limited to his many family members that passed away while Mr. Isho was in prison.

n.      Revocation of his Green Card.

o.      Limitations on employment.

p.      Felony record for the past 33 years.

q.      Failure to obtain his citizenship.

r.      Detention by Immigration and Customs Enforcement.

s.      Deportation proceedings initiated against him.

t.      Due to the risk of deportation and the instability, Plaintiff had a fear of having children that would grow up without the presence of a father.

## THIRD CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – MONELL CLAIM
### DEFENDANT CITY OF DETROIT

146.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

147.    At all times herein, Defendant City of Detroit, by and through its final policymakers, established, promulgated, implemented and maintained DPD customs, policies and/or practices of authorizing, ratifying, condoning, tolerating and approving illegal and unconstitutional actions by Detroit Police Department officers, supervisors and investigators. Those illegal and unconstitutional actions included conducting inadequate investigations into serious crimes by making arbitrary arrests in order to close cases quickly and affirmatively choosing not to develop or pursue actual leads and evidence. They also included the practices of using unreliable, discredited and improper identification techniques like five – person lineups; engaging in unduly suggestive behavior and improperly documenting lineups and

28

ignoring the constitutional duty to disclose exculpatory evidence to prosecutors and defense counsel, including by concealing improper suggestion on the part of officers conducting line-ups.

148. Defendant City of Detroit, by and through its final policymakers, maintained a custom and policy of inadequately training, supervising, and/or disciplining officers concerning all of the practices identified above.

149. Defendant City of Detroit, by and through its final policymakers, had actual or constructive notice of inadequate training and supervision in the areas identified above. Defendant City of Detroit maintained those inadequate practices despite an obvious need for training and supervision in those areas, and despite the foreseeable risk that police would predictably confront these situations without adequate training.

150. Defendant City of Detroit was therefore deliberately indifferent to the known and obvious risk that its policies, customs, and practices of inadequate training and supervision would lead to constitutional violations of the type suffered by plaintiff Tony Isho.

151. Because of these unconstitutional customs and policies maintained by Defendant City of Detroit, individuals such as Tony Isho were wrongfully arrested and convicted in violation of their constitutional rights.

152. Each of the aforementioned policies was instrumental and a driving force in the violations of rights sustained by Tony Isho, as set forth herein.

153. As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff Tony Isho has suffered severe damages,

many of which effects continue to plague Mr. Isho to this day and will plague him for the rest of his life, including but not limited to:

    a.        Deprivation of liberty

    b.        Personal and physical injuries;

    c.        Pain and suffering;

    d.        Severe mental anguish;

    e.        Emotional distress;

    f.        Extreme fear;

    g.        Economic damages including loss of income;

    h.        Infliction of physical illness and injury resulting from his confinement;

    i.        Inadequate medical care; humiliation, indignities, and embarrassment;

    j.        Degradation;

    k.        Permanent loss of natural psychological development,

    l.        Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

    m.        Damage to his relationship with his family, including but not limited to his many family members that passed away while Mr. Isho was in prison.

    n.        Revocation of his Green Card.

    o.        Limitations on employment.

    p.        Felony record for the past 33 years.

    q.        Failure to obtain his citizenship.

r.   Detention by Immigration and Customs Enforcement.

s.   Deportation proceedings initiated against him.

t.   Due to the risk of deportation and the instability, Plaintiff had a fear of having children that would grow up without the presence of a father.

## FOURTH CLAIM FOR RELIEF

### FALSE IMPRISONMENT – STATE LAW

154.   Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

155.   That this court has jurisdiction over the allegations contained in this count under the equitable doctrine of pendent and supplemental jurisdiction, as the state tort claims alleged in this count arise from the same facts and circumstances underpinning Plaintiff's federal cause of action.

156.   Defendants' actions arresting Plaintiff without probable cause and causing him to be held against his will constituted false imprisonment, as there was no lawful basis for such action.

157.   That this false imprisonment was malicious, willful, wanton, and demonstrated a reckless disregard for Plaintiff's rights.

158.   As a direct and proximate result of the acts and conduct of the Defendants in the imprisonment of Plaintiff without probable cause, Plaintiff Tony Isho has suffered serious damages, including but not limited to:

a.   Deprivation of liberty

b.   Personal and physical injuries;

c.   Pain and suffering;

d.      Severe mental anguish;

e.      Emotional distress;

f.      Extreme fear;

g.      Economic damages including loss of income;

h.      Infliction of physical illness and injury resulting from his confinement;

i.      Inadequate medical care; humiliation, indignities, and embarrassment;

j.      Degradation;

k.      Permanent loss of natural psychological development,

l.      Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.      Damage to his relationship with his family, including but not limited to his many family members that passed away while Mr. Isho was in prison.

n.      Revocation of his Green Card.

o.      Limitations on employment.

p.      Felony record for the past 33 years.

q.      Failure to obtain his citizenship.

r.      Detention by Immigration and Customs Enforcement.

s.      Deportation proceedings initiated against him.

t.      Due to the risk of deportation, Plaintiff feared if he had children, they may have to grow up without the presence of a father.

## FIFTH CLAIM FOR RELIEF

### CIVIL CONSPIRACY – STATE LAW

159. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

160. That this court has jurisdiction over the allegations contained in this count under the equitable doctrine of pendent and supplemental jurisdiction, as the state tort claims alleged in this count arise from the same facts and circumstances underpinning Plaintiff's federal cause of action.

161. The Defendants, acting in concert with other known and unknown conspirators, conspired by concerted action to accomplish the unlawful purpose, using unlawful means of charging Mr. Isho with six felony charges.

162. In furtherance of the conspiracy, the Defendants committed overt acts and were willful participants in fabrication of evidence, hiding exculpatory evidence and furthering the malicious prosecution of Mr. Isho.

163. The misconduct by the Defendants was malicious, in bad faith, intentional, willful and with reckless indifference to harm it caused Mr. Isho.

164. As a direct and proximate result of the acts and conduct of the Defendants, Plaintiff Tony Isho has suffered severe damages, many of which effects continue to plague Mr. Isho to this day and will plague him for the rest of his life, including but not limited to:

a.      Deprivation of liberty

b.      Personal and physical injuries;

c.      Pain and suffering;

d.      Severe mental anguish;

e.      Emotional distress;

f.      Extreme fear;

g.      Economic damages including loss of income;

h.      Infliction of physical illness and injury resulting from his confinement;

i.      Inadequate medical care; humiliation, indignities, and embarrassment;

j.      Degradation;

k.      Permanent loss of natural psychological development,

l.      Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.      Damage to his relationship with his family, including but not limited to his many family members that passed away while Mr. Isho was in prison.

n.      Revocation of his Green Card.

o.      Limitations on employment.

p.      Felony record for the past 33 years.

q.      Failure to obtain his citizenship.

r.      Detention by Immigration and Customs Enforcement.

s.      Deportation proceedings initiated against him.

t.      Due to the risk of deportation, Plaintiff feared if he had children, they may have to grow up without the presence of a father.

## SIXTH CLAIM FOR RELIEF

## GROSS NEGLIGENCE – STATE LAW

165.   Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

166.   That the Defendants in falsely arresting, falsely imprisoning and maliciously prosecuting Plaintiff did act in a manner that was grossly negligent in the following ways:

a.   These Defendants knew that their actions, including failure to disclose, and affirmatively concealing, information that clearly constituted exculpatory evidence.

b.   Despite this knowledge, these Defendants deliberately persisted in their failure to disclose and in concealing the exculpatory information and evidence.

c.   The Defendants knew that their failure to disclose, and in fact concealing, the exculpatory evidence would harm the Plaintiff, in the ways set forth above.

d.   Notwithstanding the knowledge that their actions, as set forth above, would seriously harm the Plaintiff, the Defendants failed to take any action to prevent that harm.

e.   There was no reasonable law enforcement purpose served by the actions of the Defendants in failing to disclose, and in fact concealing the aforementioned exculpatory evidence.

f.   Indeed, revealing and disclosing such evidence would have, in no way, weakened or undermined any reasonable or legitimated law enforcement purpose.

167.   Furthermore, Defendants improperly suggested to witnesses that they identify the bomber as Plaintiff Tony Isho, notwithstanding their knowledge that the Plaintiff was not the bomber that such improper and false suggestions would lead to serious harm and injury to the

35

Plaintiff. These improper and false suggestions were undertaken despite the fact that there was no reasonable or legitimate law enforcement purpose served by these improper and false suggestions and actions.

168. As a direct and proximate result of these grossly negligent acts and conduct of the Defendants, Plaintiff Tony Isho has suffered severe damages, many of which effects continue to plague Mr. Isho to this day and will plague him for the rest of his life, including but not limited to:

a. Deprivation of liberty

b. Personal and physical injuries;

c. Pain and suffering;

d. Severe mental anguish;

e. Emotional distress;

f. Extreme fear;

g. Economic damages including loss of income;

h. Infliction of physical illness and injury resulting from his confinement;

i. Inadequate medical care; humiliation, indignities, and embarrassment;

j. Degradation;

k. Permanent loss of natural psychological development,

l. Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.      Damage to his relationship with his family, including but not limited to his many family members that passed away while Mr. Isho was in prison.

n.      Revocation of his Green Card.

o.      Limitations on employment.

p.      Felony record for the past 33 years.

q.      Failure to obtain his citizenship.

r.      Detention by Immigration and Customs Enforcement.

s.      Deportation proceedings initiated against him.

t.      Due to the risk of deportation, Plaintiff feared if he had children, they may have to grow up without the presence of a father.

## SEVENTH CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL HARM – STATE LAW

169.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

170.    The Defendants, intentionally or recklessly failed to disclose exculpatory evidence, deliberately concealed exculpatory evidence and falsely suggested the identity of the Plaintiff as the bomber herein, when Defendants knew that not to be the case, were intentional and directed at the Plaintiff, in the following respects, among others:

a.   They were designed to result in the arrest, prosecution, conviction and long-term imprisonment of Plaintiff, even though the Defendants knew that the Plaintiff was not guilty of the alleged bombing.

b.   The actions of the Defendants were so reckless as to deliberately inflict emotional damage on the Plaintiff.

c.   The actions of the individual Defendants were in avoidance of the Governmental Immunity Act, MCLA §691.1406, et seq.

171.   As a direct and proximate result of Defendants' outrageous and grossly negligent acts and conduct of the Defendants, Plaintiff Tony Isho has suffered severe damages, many of which effects continue to plague Mr. Isho to this day and will plague him for the rest of his life, including but not limited to:

a.      Deprivation of liberty

b.      Personal and physical injuries;

c.      Pain and suffering;

d.      Severe mental anguish;

e.      Emotional distress;

f.      Extreme fear;

g.      Economic damages including loss of income;

h.      Infliction of physical illness and injury resulting from his confinement;

i.      Inadequate medical care; humiliation, indignities, and embarrassment;

j.      Degradation;

k.      Permanent loss of natural psychological development,

l.      Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

m.      Damage to his relationship with his family, including but not limited to his many family members that passed away while Mr. Isho was in prison.

n.      Revocation of his Green Card.

o.      Limitations on employment.

p.      Felony record for the past 33 years.

q.      Failure to obtain his citizenship.

r.      Detention by Immigration and Customs Enforcement.

s.      Deportation proceedings initiated against him.

t.      Due to the risk of deportation, Plaintiff feared if he had children, they may have to grow up without the presence of a father.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all Defendants:

(a)     A declaration that Defendants violated the federal rights of Plaintiff pursuant to 28 U.S.C. § 2201;

(b)     A declaration that Plaintiff was innocent of all six felony accounts for which he was convicted pursuant to 28 U.S.C. § 2201;

(c)     Compensatory damages for physical, emotional, and economic injuries suffered by plaintiff by reason of Defendants' unlawful and unjustified conduct, in an amount fair, just and reasonable and in conformity with the evidence at trial;

(d)     Punitive and exemplary damages against the individual Defendants to the extent allowable by law;

(e)     Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

(f)     The costs and disbursements of this action pursuant to 42 U.S.C. § 1920; and

(g)      Such other and further relief as appears just and proper.

## JURY DEMAND

Plaintiff, Tony Isho, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Date:  October 16, 2023                                      Respectfully submitted,


                                                            /s/ Marvie W. Neubauer
                                                            Marvie W. Neubauer
                                                            Attorney for Plaintiff
                                                            Neubauer Legal Services
                                                            3128 Walton Blvd. #226
                                                            Rochester Hills, MI 48309
                                                            (248)629-9694

                                                            Valentina Lucaj
                                                            Attorney for Plaintiff
                                                            The Lucaj Law Firm, PLLC
                                                            101 W. Big Beaver Rd. Ste 1000
                                                            Troy, MI 48084
                                                            (248) 457-7000